UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                              Case No.14-cv-1139 (PAM/JSM)

                              Plaintiff,

v.                                                     **MEMORANDUM AND ORDER**

Edward Septon, Pamela Septon,
New Millenium Capital Corporation,
Breton Parkway, Inc., Cypress Creek
Holdings, Inc., and Cerulean Moon, Ltd.,

                              Defendants.

_____

    This matter is before the Court on the Government's Motion for Summary
Judgment against Defendant Pamela Septon and the corporate Defendants.[1]   For the
reasons that follow, the Motion is granted.

## BACKGROUND

### A.    Criminal Investigation and Proceedings

    In 2005, federal authorities first began investigating what they believed were
fraudulent activities of Defendant Edward Septon and his colleagues at New Millenium
Capital Corporation, among other entities.   At that time, the Government secured an
injunction from then-Chief Judge James M. Rosenbaum of this District, freezing the
assets of the company as well as Septon's personal assets and other assets.   Preliminary

_____

[1] Defendant Edward Septon, who is pro se in this matter, is seriously ill.  Thus the Court
stayed the Government's Motion as to him but allowed it to go forward as to the
remaining Defendants.  As a practical matter, because the corporate Defendants have all
been dissolved, the only Defendant at issue in this Motion is Pamela Septon.

Injunction, United States v. Septon, Civ. No. 05-302 (JMR/FLN) (Docket No. 7) (Feb. 22, 2005).  Defendant Pamela Septon, who was at the time married to Edward Septon, was aware of the pending investigation and injunction.  (P. Septon Dep. (Docket No. 27) at 94.)

Although the injunction purported to freeze all of Mr. Septon's and his companies' assets, it incorrectly listed New Millenium's US Bank account number as ending in 5190; it in fact ended in 5199.  Preliminary Injunction, supra, at Ex. B.  Mr. Septon discovered the error in early 2008, but rather than correct it, in March 2008 he accepted from US Bank a cashier's check payable to New Millenium for more than $670,000 that closed out the account.  (Voss Decl. (Docket No. 24) Ex. A at USBA_78.)  Mr. Septon deposited the check into an account for Breton Parkway, Inc., another Defendant here.  (Id. Ex. K at IB01_14.)  Mr. Septon had incorporated Breton Parkway in Florida in early 2008 and dissolved the company in September 2009.  Mr. Septon was the sole owner of Breton Parkway; he admits it conducted no business and he was the sole successor in interest to the company on its dissolution.  (E. Septon Dep. Vol. 1 (Docket No. 25) at 31-32; Voss Decl. Ex. H, at 1.)

In August 2007, Mr. Septon was charged by information with conspiracy and bank fraud.  United States v. Septon, Crim. No. 07-272(1) (JNE).  He pled guilty in September 2007, and agreed to pay restitution and to turn over to the Government all assets covered by the 2005 Preliminary Injunction.  (Id. Docket No. 52.)  On May 28, 2008, Judge Joan N. Ericksen of this Court sentenced him to 70 months' imprisonment and ordered him to pay $2,341.892.08 in restitution to the victims of his fraud.  (Id. Docket No. 92.)  He and

his co-conspirators have paid only slightly more than $100,000 toward this obligation, with $2,206,418.05 remaining on the restitution obligation.  (Voss Decl. Ex. B.)  Mr. Septon was released from prison in February 2013.

**B.    Financial Transactions**

The Septons divorced in January 2008, during the pendency of the criminal proceedings.  (Id. Ex. F.)  However, they continued to live together until Mr. Septon went to prison, and have lived together since his release from prison.  (E. Septon Dep. Vol. 1, at 7-8.)  The divorce divided the couple's property, as discussed more fully below, but did not award either party any spousal maintenance or other support.  (Voss Decl. Ex. F, at 10.)  Both Mr. and Mrs. Septon claim that they have not worked since approximately 2003.  (E. Septon Dep. Vol. 1, at 11; P. Septon Dep. at 75-76.)

The tangled and complex transactions at issue begin with the multiple corporate entities the Septons owned.  New Millenium and its various corporate forms appear to have been the "umbrella" company for Mr. Septon's dealings.  But when New Millenium dissolved in 2008, Mr. Septon continued to use corporate forms to hide and transfer assets.  One such transfer, detailed above, was the transfer of the funds in New Millenium's US Bank account to Breton Parkway in March 2008.  These funds were ultimately distributed to the Septons' other companies or to the Septons individually.

Mrs. Septon started a company called First Centurion in 2002, although she admits that Mr. Septon managed the company.  (P. Septon Dep. at 33, 44, & Ex. 3.)  In the couple's 2008 divorce, however, ownership of First Centurion was transferred to Mr. Septon.  (Voss Decl. Ex. F at 9.)  Mr. Septon transferred First Centurion back to Mrs.

Septon in June 2009.  (P. Septon Dep., Ex. 4.)  Mrs. Septon thereafter changed the company's name to Cerulean Moon (id. at 41), and even though the company had not conducted and was not expected to conduct any business, Mrs. Septon opened a business checking account for Cerulean Moon in January 2010 with an initial deposit of $45,110. (Voss Decl. Ex. L, at FMNB_1-2.)

The couple also incorporated a business called Cypress Creek at an unspecified point during their marriage.  (P. Septon Dep. at 86.)  This company, like the others, conducted no business activities but maintained a bank account.  (Voss Decl. Ex. N, at IB02_1.)  The divorce decree awarded sole ownership of Cypress Creek to Mrs. Septon. (Id. Ex. F, at 9.)

In addition to the companies, the Septons owned two pieces of real property that are relevant to this Motion.  First Centurion owned property at 14440 28th Place North in Plymouth, Minnesota, and the couple owned a home in Naples, Florida.  The Naples home was transferred to Mrs. Septon in the divorce, as was the couple's home in Big Lake, Minnesota.  (Id. at 7-8.)

The Septons' conversion of frozen assets for their personal use began even earlier than the 2008 New Millenium/Breton Parkway transfer.  In January 2008, at the parties' joint request, Judge Rosenbaum partially lifted the injunction freezing the Septons' assets so that Mr. Septon could use some of the money to make repairs to the Plymouth property.  (Civ. No. 05-302 Docket No. 11.)  The Court specifically allowed the withdrawal of $32,593 to pay a roofing company to repair the roof.  (Id. ¶ 3.)  However, rather than using the money to pay the roofing company, Mr. Septon transferred

4

$16,296.50 of this amount, or exactly half of the money, into Cypress Creek's bank account.  (Voss Decl. Ex. N. at IB03-83.)  There is no evidence that Cypress Creek ever paid anything to repair the Plymouth property's roof or that Cypress Creek was responsible for doing so.

Mr. Septon made multiple transfers of funds to Cypress Creek in 2008, despite having no ownership interest in the company after the divorce.  In January 2008, Mr. Septon wrote checks from his personal credit-card accounts to Cypress Creek totaling $11,000.  (Id. Ex. O, at CAPO_41-46.)  In May 2008, Breton Parkway transferred a total of $3,750 to Cypress Creek.  (Id. Ex. K, at IB01_28.)

In March 2008, Mr. Septon transferred $128,383.50 from the Breton Parkway account into his personal bank account.  (Id. Ex. S, at WA02_10-11.)  He also used his corporate American Express card to pay $14,659.06 in taxes on the Naples house, a house in which he had no interest after the divorce.  (Id. Ex. P.)  He then paid off the American Express account using funds from Breton Parkway.  (Id. Ex. K, at IB01_26.)  Also in March 2008, Mr. Septon used $155,000 in Breton Parkway's funds to buy 151 gold coins worth $154,750.  (Id. Ex. K, at IB01_16; Ex. Q, at GULF-3.)  He gave these coins to Mrs. Septon, who over time sold them for a total of $179,153.  (P. Septon Dep. at 16; Voss Decl. Ex. R.)  In April 2008, Mr. Septon paid $27,579.50 to pay off the car loans on his and Mrs. Septon's Range Rovers.  (E. Septon Dep. Vol. 1, at 44 & Ex. 2.)  These funds came from Breton Parkway's account.  (Voss Decl. Ex. K, at IB01_11.)

After Mr. Septon's sentencing in late May 2008, Mr. Septon continued to transfer funds for Mrs. Septon's use.  In early June 2008, he used $25,500 from his personal bank

account to pay fees related to the listing for sale of the Naples house. (Id. Ex. S, at WA02_29.)  In June 2009, Mr. Septon used $40,000 from Breton Parkway to buy an additional 41 gold coins. (Id. Ex. K, at IB01_15; Ex. Q, at GULF_2.)  Instead of giving these coins to Mrs. Septon, Mr. Septon asked a friend to hide the coins in the Naples house. (E. Septon Dep. Vol. 1, at 50-51.)  Mr. Septon then told Mrs. Septon where she could find the coins. (Id. at 51.)  Mrs. Septon eventually sold the coins for $45,110 and deposited this money into Cerulean Moon's bank account. (P. Septon Dep. at 101-102 & Ex. 5.)

When Breton Parkway dissolved in 2009, Mr. Septon transferred $12,400 from the company's account to his attorney, with the understanding that $2,400 of this amount would be given to Mrs. Septon. (E. Septon Dep. Vol. 1 at 104.)  When the attorney was later disbarred and his funds put into trust, Mr. Septon directed the trust to disburse the entire $12,400 to Mrs. Septon, who put it in her personal bank account. (Id. at 105; P. Septon Dep. at 102-03.)  Finally, in 2011, Mrs. Septon sold the Plymouth property.  She received $36,579.80 in the sale for her alleged "personal contributions" to the property, many of which she concedes came from the same of the 41 gold coins. (P. Septon Dep. at 35-36.)  And $109,619.52 from the sale was transferred into Cerulean Moon's bank account. (Id. at 114 & Ex. 2; Voss Decl. Ex. L. at FMNB_60-61.)  Mrs. Septon used the money in this bank account to pay her living expenses of approximately $5,000 per month. (P. Septon Dep. at 114.)

The Septons have spent all of the money they received from these transactions and liquidated all the assets discussed above.  In this Motion, the Government seeks a money judgment that it can enforce against Mrs. Septon's other property.

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Enter. Bank, 92 F.3d at 747.  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The Federal Debt Collection Procedure Act, 28 U.S.C. §§ 3001 et seq., provides a civil mechanism for the Government to recover money from criminal judgment debtors. The FDCPA treats transfers differently depending on whether the transfers occurred before or after the judgment arose.  Both pre- and post-judgment transfers are at issue in this case.  The Government contends that the transfers in this case violated three separate provision of the FDCPA, any one of which would be sufficient to hold the transfers void and allow the Government to collect from Mrs. Septon.

A.      **Post-Judgment Transfers**

As relevant to this case, a post-judgment transfer is fraudulent if the debtor does not receive a reasonably equivalent value for the transfer and the debtor is insolvent at the time or is rendered insolvent by the transfer.  28 U.S.C. § 3304(a)(1)(A)-(B).

Mrs. Septon argues that Mr. Septon received reasonably equivalent value for the transfers he made to her and on her behalf because she used that money to pay her living and household expenses.  She contends that Mr. Septon paid these expenses for her because they co-habitated before Mr. Septon went to prison and he returned to live with her after his incarceration.  Mrs. Septon argues that there are factual issues to be determined as to reasonably equivalent value, making summary judgment inappropriate.

Mrs. Septon is correct that the determination whether a transfer is for reasonably equivalent value is a question of fact.  In re Kendall, 440 B.R.526, 533 (8th Cir. B.A.P. 2010).  But even if Mrs. Septon disputes some of the facts in this matter, summary judgment may still be appropriate.  See, e.g., Torgerson v. Rochester, 643 F.3d 1031, 1052 (8th Cir. 2011) ("[A] disputed fact alone will not defeat summary judgment, rather there must be a genuine issue of material fact.").  And as noted above, a party opposing summary judgment must set forth specific facts in the record showing that there is a genuine issue for trial.

To meet her burden in this regard, Mrs. Septon must show that there are facts in the record that Mr. Septon received reasonably equivalent value for the transfers outlined above.  Mrs. Septon contends that payments to a debtor's spouse or co-habitant that are used for household expenses constitute reasonably equivalent value.  United States v.

Goforth, 465 F.3d 730, 736 (6th Cir. 2006).  There are two problems with Mrs. Septon's argument.  First, she has not substantiated that she required more than $480,000 for household expenses during the time period at issue, including the years when Mr. Septon was incarcerated.  This failure alone is likely fatal to her argument that Mr. Septon received reasonably equivalent value for the transfers at issue.

Second, although living-expense payments may constitute reasonably equivalent value in some cases, those cases are very different from the facts here.  See, e.g., Goforth, 465 F.3d at 736 (finding that payments to debtor's current wife for couple's joint living expenses not fraudulent); In re Montalvo, 333 B.R. 145, 149-50 (Bankr. W.D. Ky. 2005) (concluding that payments for household expenses for debtor's wife and seven children whom debtor had "legal obligation" to support not fraudulent transfers); In re Gonzalez, 342 B.R. 165, 172-73 (Bankr. S.D.N.Y. 2006) (holding that payments made on mortgage for home in which debtor lived sporadically and in which his minor child lived were not fraudulent).  Here, the Septons were divorced at the time of the transfers and Mr. Septon had no spousal-maintenance or child-support obligations.  Moreover, because Mr. Septon was incarcerated during the time many of these transfers were made, the payments were solely to support Mrs. Septon, who was no longer his wife.

To the extent that Mrs. Septon argues that Mr. Septon received reasonably equivalent value in the form of her love and support, the Eighth Circuit Court of Appeals has explicitly refused to recognize such benefits as reasonably equivalent value in the context of fraudulent transfers.  Specifically, "intangible, psychological benefits" such as "indirect, non-economic benefits in the form of a release of a possible burden on the

marital relationship and the preservation of the family relationship. . . do not constitute reasonably equivalent value." In re Bargfrede, 117 F.3d 1078, 1080 (8th Cir. 1997) (citing, inter alia, In re Treadwell, 699 F.2d 1050, 1051 (11th Cir. 1983) (love and affection are not benefits that can establish reasonably equivalent value)).

The Government has demonstrated that no genuine issues of fact remain as to whether Mr. Septon received "reasonably equivalent value" for the post-judgment transfers, and the Court therefore determines as a matter of law that he did not receive such value.

Mrs. Septon does not address the second element of the post-judgment fraudulent-transfer test: whether Mr. Septon was insolvent or rendered insolvent by the transfers. Mr. Septon admitted in his deposition that he has been insolvent since 2004. He did not have sufficient assets to pay his debts, and thus he meets the definition of insolvent in the statute. See 28 U.S.C. § 3302(a).

Because Mr. Septon did not receive reasonably equivalent value for the post-judgment transfers he made to Mrs. Septon, and Mr. Septon was insolvent at the time of the transfers, those transfers are fraudulent and must be set aside.

## B.     Transfers No Matter When Made

The Government argues that all of the transfers here, whether pre- or post-judgment, were fraudulent because Mr. Septon made the transfers with the actual intent to defraud a creditor. Thus, whether or not Mr. Septon received reasonably equivalent value for the transfers or whether the transfers pre-dated the judgment is ultimately

irrelevant.   If Mr. Septon made the transfers in order to hide the money from the Government, those transfers are void.

**1.      Badges of Fraud**

Section 3304(b) provides that a transfer is fraudulent "if the debtor makes the transfer . . . with actual intent to hinder, delay or defraud a creditor."   28 U.S.C. § 3304(b)(1)(A).  The statute lists eleven "badges of fraud" that a court may consider in making the actual-intent determination.  Id. § 3304(b)(2).  According to the Government, at six of these "badges" are present here.

a.      Transfer to an insider -- § 3304(b)(2)(A)

The statute defines "insider" to include a relative or general partner of the debtor, or a corporation in which the debtor is an officer, director, or control person.  28 U.S.C. § 3304(b)(2)(A).   Under Minnesota's identical version of the statute, a former spouse, who continued to live with the ex-spouse/debtor, is an insider.   Citizens State Bank Norwood Young Am. v. Brown, 849 N.W.2d 55, 63 (Minn. 2014).  Mr. Septon lived with Mrs. Septon after the divorce, she visited him every weekend during his five-year incarceration, and he has lived with her since his release from prison.  Mrs. Septon is a "relative" within the definition of insider.

b.      Debtor sued before transfer made -- § 3304(b)(2)(D)

All of the transfers at issue here were made years after the Septons knew of Mr. Septon's likely criminal charge and restitution obligation.  Judge Rosenbaum froze Mr. Septon's assets in 2005, but despite this, Mr. Septon managed to secure funds that he eventually gave to Mrs. Septon.  Moreover, some of the transfers were made after Mr.

Septon pled guilty and acknowledged his restitution obligations in September 2007. This badge of fraud is present here.

      c.        Transfer of substantially all assets -- § 3304(b)(2)(E)

Of the more than $670,000 that Mr. Septon received from New Millenium's US Bank account, he transferred at least $500,000 to Mrs. Septon. His only income is now social security of approximately $1,000 per month. This subsection is likewise present here.

      d.        Reasonably equivalent value -- § 3304(b)(2)(H)

As discussed above, the post-judgment transfers do not meet the "reasonably equivalent value" test. The prejudgment transfers consist primarily of payments Mr. Septon made to Cypress Creek for things like property taxes on the Naples house. At the time he made the payments, Mr. Septon had no interest in Cypress Creek or in the Naples house. As noted above, he also paid off Mrs. Septon's car loan after their divorce, even though she received the car in the divorce. And Mr. Septon bought gold coins after the divorce and gave them to Mrs. Septon, despite having no obligation to make spousal maintenance payments. Mr. Septon did not receive reasonably equivalent value for the transfers and this badge of fraud is therefore present.

      e.        Insolvent debtor -- § 3304(b)(2)(I)

As discussed, Mr. Septon was insolvent.

      f.        Timing of transfer -- § 3304(b)(2)(J)

A transfer bears the indicia of fraud if it "occurred shortly before or shortly after a substantial debt was incurred." 28 U.S.C. § 3304(b)(2)(J). The transfers here occurred

between January 2008 and January 2013, both shortly before and after the Court imposed substantial restitution obligations on Mr. Septon, and long after both Mr. and Mrs. Septon were aware of those obligations. This badge of fraud is present in this case.

Under these circumstances, the Government has established that Mr. Septon made the transfers discussed above with the actual intent to defraud the United States and evade his restitution obligations. Those transfers are therefore void.

### 2. § 3304(b)(1)(B)

This section prohibits transfers by a person with insufficient assets who does not obtain reasonably equivalent value in return. This is sometimes called constructive fraud. Given the discussion above, it is clear that, even if not actually fraudulent, the transfers were constructively fraudulent and therefore void.

### C. Good Faith

Mrs. Septon argues that she is a good-faith transferee within the meaning of the statute. This statutory defense provides that a "transfer or obligation is not voidable under section 3304(b) with respect to a person who took in good faith and for a reasonably equivalent value . . . ." 28 U.S.C. § 3307(a). But the fact that Mrs. Septon did not give reasonably equivalent value alone renders this defense inapposite. More importantly, Mrs. Septon knew of Mr. Septon's restitution obligations and his financial condition, and she accepted the money despite this knowledge. See United States v. Schippers, 982 F. Supp. 2d 948, 973 (S.D. Iowa 2013) (Spouse who "was aware of [the debtor's] legal and financial situations at the time" of the transfers cannot avail herself of the good-faith defense.). Mrs. Septon is not a good-faith transferee.

**D.    Remedy**

The statute provides the Government with broad relief to recoup money lost in fraudulent transfers.  The relief may include:

> (1)    avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States;
>
> (2)    a remedy under this chapter against the asset transferred or other property of the transferee; or
>
> (3)    any other relief the circumstances may require.

28 U.S.C. § 3306.

The Government asks for a money judgment against Mrs. Septon and the companies.  The Government notes that because the Septons have spent all of the money at issue, the Government's only remedy is a money judgment against Mrs. Septon, which will allow the Government to proceed against Mrs. Septon's other property.  The Government has established that it is entitled to a money judgment in this matter.

The Government asks for a judgment in the amount of $496,921.41.  But the transactions at issue total $452,384.38.[2]  The judgment will reflect that amount.

**CONCLUSION**

The transfers discussed above are all fraudulent and therefore void.  The Governement is entitled to a money judgment so that it may seek Mr. Septon's restitution obligations through proceedings against Mrs. Septon's remaining property.

---

[2] The Court's calculations do not include the "profit" Mrs. Septon made from the sale of the gold coins, but only the initial amount Mr. Septon withdrew from his accounts to pay for those coins.  The Government did not argue that the profit ($24,153 for the sale of the first set of 151 coins and $5,110 for the sale of the set of 41 coins) was somehow fraudulently transferred to Mrs. Septon.

Accordingly, **IT IS HEREBY ORDERED that:**

1.   The Government's Motion for Summary Judgment (Docket No. 22) is

     **GRANTED**;

2.   The Clerk shall enter judgment in the amount of $452,384.38 against

     Defendant Pamela Septon; and

3.   There being no just reason for delay under Fed. R. Civ. P. 54(b), the Clerk

     shall enter judgment against Mrs. Septon accordingly.

Dated:  May 26, 2016

                                        s/ Paul A. Magnuson
                                        Paul A. Magnuson
                                        United States District Court Judge